VOTE CHOICE, INC.; Gun Owners Political Action Committee; Elizabeth Leonard; Pasquale E. Melaragno; Jane Doe; Rhode Island Affiliate, American Civil Liberties Union, Inc.; and Hasbro, Inc., Plaintiffs,

v.

Joseph DI STEFANO, in his official capacity as Chairman of the Rhode Island Board of Elections; Edward Grace in his capacity as Chairman of the Rhode Island Public Telecommunications Authority; and James Malachowski, in his capacity as Administrator for the Rhode Island Division of Public Utilities, Defendants.

Civ. A. No. 92–0451–P.

United States District Court,
D. Rhode Island.

Jan. 12, 1993.

See also 814 F.Supp. 186.

Matthew F. Medeiros, Neal J. McNamara, Flanders & Medeiros, Providence, RI, for plaintiff.

Anthony J. Bucci, Jr., Licht & Semonoff, Providence, RI, for defendant.

Donald G. Elbert, Jr., Providence, RI, Carol F. Lee, Roger M. Witten, Eric Mogilnicki, Wilmer, Cutler & Pickering, Donald J. Simon, Sonosky, Chambers, Sachse & Endreson, Washington, DC, for amicus—Common Cause of R.I. and Common Cause.

## MEMORANDUM AND OPINION

PETTINE, Senior District Judge.

The plaintiffs in this case present a constitutional challenge to several provisions of Rhode Island's recently amended campaign finance law. The challenged provisions attempt to regulate and/or prohibit certain contributions and expenditures with respect to corporations, political action committees ("PACs"), and publicly-financed candidates. Specifically, plaintiffs challenge: R.I.G.L.

§ 17–25–10.1(j), a provision banning independent corporate expenditures to influence a ballot question; R.I.G.L. § 17–25–10(a)(3), a provision allegedly requiring corporations to establish PACs for the purpose of making contributions and expenditures to influence a ballot question; R.I.G.L. § 17–25–15(c)(1), a provision requiring public disclosure of all contributions to Rhode Island PACs; and R.I.G.L. § 17–25–30, a provision of Rhode Island's public financing scheme that grants free television advertising and a higher aggregate contribution limit to publicly funded candidates.[1]

Having received all papers from the parties, including amici[2], I now consider the constitutionality of each of these provisions under the First and Fourteenth Amendments. For the reasons stated below, I find that:

(I) R.I.G.L. § 17–25–10.1(j), to the extent that it prohibits corporations from making independent expenditures to influence the outcome of a ballot question, violates plaintiffs' rights under the First and Fourteenth Amendments;

(II) R.I.G.L. § 17–25–10(a)(3) does not require corporations, profit or non-profit, to establish PACs for the purpose of making contributions and expenditures to influence the outcome of a ballot question, and, therefore, does not violate plaintiffs' rights under the First and Fourteenth Amendments;

(III) R.I.G.L. § 17–25–15(c)(1)'s PAC disclosure requirement violates plaintiffs' rights under the First and Fourteenth Amendments;

(IV) R.I.G.L. § 17–25–30's incentive provisions for publicly funded candidates do not violate plaintiffs' First or Fourteenth Amendment rights; and

(V) R.I.G.L. §§ 17–25–30's free television advertising provisions are consistent with, and not preempted by, § 315 of the Communications Act, 47 U.S.C. § 315.

I will address each of these provisions in turn.

## I. The Ban on Corporate Contributions and Expenditures—§ 17–25–10.1(j)

R.I.G.L. § 17–25–10.1(j) provides:

No entity other than an individual, a political action committee which is duly registered and qualified pursuant to the terms of this chapter, political party committee authorized by title 17 of the general laws, or an authorized committee of an elected official or candidate established pursuant to this chapter shall make any contribution to or any expenditure on behalf of or in opposition to any candidate, ballot question, political action committee or political party.

On its face, this provision appears to prohibit corporations from engaging in any political activity, whether through direct contributions to any candidate, PAC or political party, or through independent expenditures on behalf of or in opposition to any candidate, ballot question, PAC or political party. Plaintiffs American Civil Liberties Union, Inc. ("ACLU") and Hasbro, Inc. ("Hasbro") challenge that aspect of § 17–25–10.1(j) that prohibits independent corporate expenditures to influence ballot questions.

In an earlier Memorandum and Order of this Court dated October 23, 1992, relying directly upon *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), I permanently enjoined enforcement of § 17–25–10.1(j) "to the extent it prohibits corporations from making any independent contributions and expenditures

---

1. Count IV of the Amended Complaint also challenges the constitutionality of R.I.G.L. § 17–25–15(d). This provision allows the Rhode Island Board of Elections to reject PAC names which are misleading and/or do not accurately identify the membership or contributor base of the committee. Because the parties have presented little direct evidence and no argument with respect to this provision, I decline to rule on its constitutionality.

2. Due to a decision by Defendants Grace and Malachowski not to defend the free television provisions of § 17–25–30, the Court allowed Common Cause, Common Cause of Rhode Island and H. Philip West, Jr. to file an amicus brief in defense of these provisions. The Court also permitted Common Cause and Common Cause of Rhode Island to file an amicus brief on behalf of the Board of Elections ("the Board") in defense of § 17–25–15(c)(1)'s disclosure provision for PACs. For convenience, I refer to these participants as "amici" or "Common Cause."

with respect to ballot questions." In its Post–Hearing Memorandum, the Board suggests a clarification of the permanent injunction Order.

The Board argues persuasively that the instant challenge extends only to § 17–25–10.1(j)'s ban on independent corporate *expenditures* in connection with ballot questions. Both the Amended Complaint and the evidence presented at the preliminary injunction hearing indicate that plaintiffs ACLU and Hasbro wished to expend their own funds (i.e., make an independent expenditure) to defeat a ballot question in the November 1992 general election. Plaintiffs made no allegation and presented no evidence, however, that Hasbro or the ACLU desired to *contribute* funds (as opposed to making an independent expenditure) directly to any other entity, such as a PAC, formed for the purpose of defeating that ballot question. Accordingly, there are no challenges to and, therefore, no issues involving corporate *contributions* to entities such as PACs with respect to ballot questions, nor any challenges to the ban on corporate contributions and independent expenditures with respect to candidates or political parties.

Because plaintiffs have raised, and offered documentary evidence in support of, this narrow challenge to § 17–25–10.1(j), and for the reasons I have already stated in my October 23, 1992 Memorandum and Order, I hereby amend and limit my permanent injunction to enjoin the Board from enforcing only that portion of § 17–25–10.1(j) that prohibits corporations from making any *independent expenditures* with respect to ballot questions. This ruling is consistent with the teachings of *Bellotti*, as well as with the allegations

raised, and facts adduced, by plaintiffs at the preliminary injunction hearing.[3]

## II. The Corporate PAC Requirement— § 17–25–10(a)(3)

■  R.I.G.L. § 17–25–10(a)(3) addresses the lawful methods of contributing to influence a ballot question. It provides, in pertinent part:

(a) No contribution shall be made or received, and no expenditures shall be directly made or incurred, ... to advocate the approval or rejection of any question in any election except through:

(3) The duly appointed campaign treasurer or deputy campaign treasurer of a political action committee.

Plaintiffs ACLU and Hasbro allege that this provision requires corporations to establish PACs in order to make contributions or expenditures to influence a ballot question. So interpreted, plaintiffs argue, this PAC requirement impermissibly burdens their free speech rights under the First and Fourteenth Amendments. *See Federal Election Com. v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (holding unconstitutional, as applied to non-profit corporations, a federal statute prohibiting direct expenditure of corporate funds in connection with election to public office).

The Board argues that the clear purpose of § 17–25–10(a)(3) is *to focus responsibility* for the accurate filings of campaign finance reports on campaign treasurers or deputy treasurers. It further contends that the provision does not, and has never been interpreted to, require corporations to establish PACs for the purpose of making contributions and expenditures with respect to ballot questions.[4] In support of its position, the

---

**3.** Thus, corporations such as plaintiffs ACLU and Hasbro continue to be subject to § 17–25–10.1(j)'s general prohibition on corporate contributions to candidates, PACs (including PACs that advocate positions on ballot questions), and political parties, and its ban on independent corporate expenditures with respect to candidates, PACs and political parties.

**4.** Reference to § 17–25–10(b), as amended by the 1992 Act (amendment underscored), provides strong support for this interpretation:

"(b) It shall be lawful, however, for any person *not otherwise prohibited by law and* not acting

in concert with any other person or group, to expend personally from that person's own funds a sum which is not to be repaid to him or her for any purpose not prohibited by law to support or defeat a candidate or to advocate the approval or rejection of any question...."

"Person" is defined in § 17–25–3(i) as "an individual, partnership, committee, association, corporation, and any other organization." Corporations such as plaintiffs Hasbro and ACLU clearly fall within this definition.

Board asks this Court to take judicial notice of the public records maintained by the Board of Elections in the form of campaign finance reports filed prior to 1992 under Chapter 17–25 of the Rhode Island General Laws. These records, the Board avers, demonstrate that corporate contributions and expenditures prior to 1992 were made directly and not through PACs, and that the Board has always regarded such contributions and expenditures as lawful under the provisions of § 17–25–10(a)(3).

I acknowledge that, from a purist's standpoint, the wording of § 17–25–10(a)(3) is susceptible to plaintiffs' interpretation. However, the language of § 17–25–10(b), quoted *supra* note 4 (authorizing independent expenditures not otherwise prohibited by law), and the weight of the evidence concerning historical enforcement of § 17–25–10(a)(3), amply support the Board's interpretation that § 17–25–10(a)(3) does not require corporations, profit or non-profit, to establish PACs. As a mere record keeping and enforcement measure, it does not unduly impinge upon any constitutional rights of plaintiffs ACLU and Hasbro. Therefore, I dismiss all plaintiffs' claims with respect to this provision.[5]

### III. First Dollar Disclosure for PACs—§ 17–25–15(c)(1)

■ Section 17–25–15(c)(1), a new provision of the campaign finance law, requires all Rhode Island PACs, with the exception of labor union and corporate check-off plans, to report the source and amount of all contributions, regardless of amount ("first dollar disclosure"). It provides, in pertinent part:

(c) In addition to all other reporting requirements, each political action committee shall include in each report required to be filed by this chapter:

(1) The source and amount of all funds received by the committee; provided however, that funds received through a regular payroll checkoff plan in which the aggregate contribution from each individual does not exceed one hundred dollars ($100) per calendar year shall report [sic] the name and address of each entity transferring such funds to the committee, the aggregate amount received from the payroll checkoff, and the total number of contributors; and provided however, that funds received by the political action committee of a labor organization from the members of said organization in amounts not exceeding twenty-five dollars ($25.00) per calendar year from a single source shall be reported by the aggregate amount received and the total number of members of the labor organization contributing.

Plaintiff Vote Choice, a Rhode Island PAC dedicated to keeping abortion safe, legal, and available in Rhode Island, along with Plaintiff Jane Doe, a potential contributor to Vote Choice, challenge this first dollar disclosure requirement on First Amendment and Equal Protection grounds. Plaintiff Gun Owners PAC ("GOPAC"), a PAC advocating the rights of firearms owners and sportsmen, along with plaintiff Pasquale Melaragno, a contributor to GOPAC, mount an identical challenge. These plaintiffs allege (1) that § 17–25–15(c)(1) impermissibly deters Vote Choice's and GOPAC's usual donors from contributing because of possible recriminations from family, church, and workplace, and (2) that it invidiously discriminates in favor of corporate and labor groups.

The Supreme Court has repeatedly found that compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment. *See Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 656, 46 L.Ed.2d 659 (1976) (citing *Gibson v. Florida Legislative Comm.,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231

---

**5.** I note that this finding departs from the analysis of § 17–25–10(a)(3) found in the Court's October 23, 1992, Memorandum and Order. That analysis was based upon an erroneous stipulation by the Board of Elections that this provision required both non-profit and for-profit corporations to establish PACs for the purpose of making contributions and expenditures with respect to a ballot question. The Board subsequently withdrew from this stipulation. Thus, I leave for another day the issue whether a for-profit corporation may be required to establish a segregated fund or PAC for the purpose of making contributions and expenditures with respect to a ballot question.

(1960); *Bates v. Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)). In addition, the Court has long recognized "that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate government interest." *Buckley*, 424 U.S. at 64, 96 S.Ct. at 656. Instead, the subordinating interests of the State must survive "exacting scrutiny," and there must be a "relevant correlation" or "substantial relation" between the governmental interest and the information required to be disclosed. *Id.* "This type of scrutiny is necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action, but indirectly as a result of the government's conduct in requiring disclosure." *Id.* (citing *NAACP v. Alabama*, 357 U.S. at 461, 78 S.Ct. at 1171). In addition, in light of the burden imposed upon freedom of expression and association by compelled disclosure, the State must show that disclosure measures are narrowly tailored to promote compelling interests. *See Austin v. Michigan State Chamber of Commerce*, 494 U.S. 652, 655, 110 S.Ct. 1391, 1395, 108 L.Ed.2d 652 (1990) (statutory classifications that impinge on First Amendment Rights must be narrowly tailored to serve compelling governmental interests); *Eu v. San Francisco County Democratic Comm.*, 489 U.S. 214, 222, 109 S.Ct. 1013, 1019, 103 L.Ed.2d 271 (1989) (same).

In the campaign finance realm, the Supreme Court has noted the potentially significant burdens on protected association and expression imposed by disclosure measures. The Court has acknowledged, for example, that laws requiring public disclosure of political contributions will "deter some individuals who otherwise might contribute" and that, "[i]n some instances, disclosure may even expose contributors to harassment or retaliation." *Buckley*, 424 U.S. at 68, 96 S.Ct. at

658. "These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which [the state] has sought to promote ..." *Id.*

At the preliminary injunction hearing, plaintiffs demonstrated that first dollar disclosure of PAC contributions significantly chills protected expression and association. Particularly with respect to special interest PACs that advocate controversial points of view on social issues, plaintiffs showed that first dollar disclosure deters individuals who might otherwise contribute.[6] Even the Chairman of the Board of Elections, Joseph Di Stefano, admitted that first dollar disclosure substantially burdens plaintiffs' rights. Relying on *Buckley*, however, the Board and amici argue that, despite these burdens, first dollar disclosure directly serves compelling state interests and is narrowly tailored to serve those interests.

In *Buckley*, the Supreme Court unanimously held that campaign finance disclosure provisions serve compelling state interests. The Court identified three governmental interests "sufficiently important to outweigh" any resulting infringement on the "privacy of association and belief guaranteed by the First Amendment." *Id.* at 64, 66, 96 S.Ct. at 656, 657. First, campaign finance disclosure informs the electorate where the candidate stands in the political spectrum and alerts "the voter to the interests to which a candidate is most likely to be responsive." *Id.* at 67, 96 S.Ct. at 657. *See also Citizens Against Rent Control v. Berkeley*, 454 U.S. 290, 294 n. 4, 298, 102 S.Ct. 434, 436 n. 4, 438, 70 L.Ed.2d 492 (1981) (recognizing a city's contribution disclosure law as an effective prophylactic measure for ensuring that voters are able to evaluate the arguments before them). Second, "disclosure requirements deter actual corruption and avoid the appearance of corruption." *Buckley*, 424 U.S. at 67, 96 S.Ct. at 657. Third, "disclosure requirements are an essential means of gathering the data necessary to detect violations of [ ] contribution limitations." *Id.* at 68, 96 S.Ct.

---

**6.** For example, Marti Rosenberg, the Director of plaintiff Vote Choice, testified that in 1990 and 1992, her PAC received donations in amounts ranging from $5.00 to $500.00, with the average donation at approximately $25.00. Plaintiff Jane

Doe, a 28 year-old practicing Catholic, testified that she had planned to make a contribution of approximately $25.00 to a pro-choice PAC in 1992, but decided not to do so upon learning of the disclosure requirements of § 17–25–15(c)(1).

at 658.[7] The Board contends that each of these interests support the first dollar disclosure measure. I agree.

Having found that first dollar disclosure significantly burdens individual rights of expression and political association, and that the Board has proffered compelling state interests in disclosure, the controlling issue here is whether first dollar disclosure is sufficiently narrowly tailored to serve the state's interests.

In this regard, the Board relies most heavily on the importance of first dollar disclosure in facilitating enforcement of Rhode Island's overall campaign contribution limits. For example, R.I.G.L. § 17–25–7(a) requires public disclosure of all contributions to any candidate in excess of $100.00 from a single source within one calendar year. The Board contends that if the General Assembly had included a threshold in its PAC contribution reporting provision, as well, this would have opened a loophole for concealed contributions to candidates. Because there are no limits to the number of PACs that may be formed, the Board reasons, PACs with similar political interests will multiply exponentially in order to funnel forbidden contributions to candidates.[8]

In response, plaintiffs argue that the Board has offered absolutely no evidentiary support for the proposition that Rhode Island is on the verge of a profound multiplication of PACs with similar interests, eager to help those bent on evasion of the campaign finance laws.

No court has ever directly passed upon or approved a first dollar public disclosure threshold. Common Cause cites to several cases, however, for the proposition that state legislatures and courts have found no constitutional infirmity in requiring public disclosure of political contributions below $100.00. *See Oregon Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F.Supp. 1255 (D.Ore.1977); *Lukens v. Brown*, 368 F.Supp. 1340 (S.D.Oh.1974); *Doe v. Martin*, 404 F.Supp. 753 (D.D.C.1975); *see also Citizens Against Rent Control*, 454 U.S. at 294, 298 n. 4, 102 S.Ct. at 436, 438 n. 4. While *Oregon Socialist Workers* approved a first dollar *record keeping* threshold, none of these cases support a first dollar public *disclosure* threshold.

In *Buckley*, the Supreme Court unanimously upheld a $100.00 public disclosure threshold for contributions in a federal electoral contest. *Buckley*, 424 U.S. at 84, 96 S.Ct. at 665. *Buckley* also upheld a $10.00 record keeping threshold for political committees that contributed to federal electoral contests. *Id.* Common Cause argues that the enormous difference between the amounts spent on federal electoral contests and the amounts spent on Rhode Island's elections renders the Rhode Island General Assembly's first dollar reporting requirement "virtually indistinguishable" from the measures upheld in *Buckley*.[9]

With respect to this contention, I note that the *Buckley* Court observed:

[t]he $10.00 and $100.00 thresholds are indeed low. Contributors of relatively small amounts are likely to be especially sensitive to recording or disclosure of their political preferences. These strict requirements may well discourage participation

---

7. These interests have been found equally compelling at the state level. *See, e.g., Lukens v. Brown*, 368 F.Supp. 1340 (S.D.Ohio 1974) (rejecting a First Amendment challenge to Ohio's campaign contribution disclosure law); *Oregon Socialist Workers 1974 Campaign Comm. v. Paulus*, 432 F.Supp. 1255 (D.Ore.1977) (upholding Oregon's campaign finance disclosure law).

8. For example, if PACs were only required to report contributions in excess of $100.00, all contributions to PACs of $99.00 or less would be invisible. By contributing to a series of similarly aligned PACs, a person or organization could transfer a sizable contribution to a candidate without detection.

9. According to Common Cause, for example, the average candidate for U.S. Representative spent $264,232 in the 1990 elections. The average candidate for the U.S. Senate spent $2,810,728. Chairman Di Stefano, by contrast, testified that a candidate for the Rhode Island General Assembly might raise $3,000 to $4,000. Thus, the argument goes, a contribution of $100 to a U.S. Senate campaign is equivalent to a contribution of 14 cents to a Rhode Island General Assembly campaign. A contribution of $100 to a U.S. Representative campaign is equivalent to a contribution of $1.52 to a Rhode Island General Assembly campaign.

by some citizens in the political process, a result that Congress could hardly have intended. Indeed there is little legislative history to indicate that Congress focused carefully on the appropriate level at which to require recording and disclosure.... But we cannot require Congress to establish that it has chosen the highest reasonable threshold. The line is necessarily a judgmental decision, best left in the context of this complex legislation to congressional discretion. We cannot say, on this bare record, that the limits designated are wholly without rationality. *Buckley*, 424 U.S. at 83–34[, 96 S.Ct. at 665.]

While the Court upheld the $10 record keeping and $100 public disclosure thresholds, it did so only after determining that there was "no warrant for assuming that public disclosure of contributions between $10.00 and $100.00 is authorized by the Act." *Id.* at 84, 96 S.Ct. at 665. As a result, the Court specifically declined to reach the question whether information concerning contributions of this size could be made available to the public "without trespassing on First Amendment rights." *Id.*

Defendants do not deny that first dollar disclosure burdens plaintiffs' right to choose their preferred method of political expression and association. Moreover, the Board's primary justification for the measure—facilitating strict enforcement of campaign contribution limitations—could be achieved by something less than first dollar public disclosure. For example, a low record keeping threshold, even a first dollar *record keeping* threshold, coupled with a higher public disclosure threshold, would achieve substantially the same ends. Such record keeping would facilitate audits of PACs suspected of funneling illegal contributions to candidates, without unduly burdening the speech and association rights of Rhode Island citizens such as plain-

tiff Doe. Admittedly, such a scheme would not achieve entirely the "fully informed electorate" goal espoused by the Board. It would, however, provide a less draconian and more balanced approach while still achieving disclosure of large, potentially corrupting contributions.[10]

As the Supreme Court noted in *Buckley*, "[t]he First Amendment protects political association as well as political expression. The constitutional right of association ... stem[s] from the Court's recognition that '[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association.'" *Buckley*, 424 U.S. at 15, 96 S.Ct. at 632 (quoting *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958)). Plaintiffs have demonstrated the heavy toll upon individual expression and group association engendered by first dollar disclosure. Moreover, the Board's contention that, without first dollar disclosure, rampant multiplication of similarly politically aligned PACs will enable circumvention of the campaign finance laws, is wholly unsupported by the record. In sum, the first dollar public disclosure scheme is not narrowly tailored to achieve the State's interest in preventing corruption and circumvention of the campaign finance laws.

Without engaging in the type of judicial line-drawing eschewed by the *Buckley* Court, 424 U.S. at 83–84, 96 S.Ct. at 665, I hold simply that the General Assembly must establish at least some minimum threshold for public disclosure of contributions to PACs. While I do not purport to require the General Assembly to establish that it has chosen the highest reasonable threshold, the constitution requires some threshold to leave sufficient breathing room for our cherished First Amendment freedoms.[11]

**10.** Common Cause argues that this alternative would not enable the Board to enforce a different provision of the finance laws—the PAC sponsorship requirement. Section § 17–25–15(e) requires PACs who receive more than half of their funds from one source, such as a company or profession, to identify that source in their name. Common Cause does not explain, however, why a record keeping requirement rather than full disclosure of the names of all contributors would

not assist the Board in enforcing this provision. In addition, the Board offered little evidence at the preliminary injunction hearing of widespread non-compliance with the PAC sponsorship requirement.

**11.** Having decided this issue on First Amendment grounds, I need not address plaintiffs' equal protection challenge to § 17–25–15(c)(1).

## IV. Incentives for Publicly Funded Candidates—§ 17–25–30

Rhode Island recently enacted public financing of campaigns through public matching funds in an attempt, among other things, to reduce both corruption in the electoral process and the skyrocketing cost of running for statewide office. *See* R.I.G.L. § 17–25–18. In response to less than enthusiastic candidate participation, the General Assembly acted to provide certain incentives for candidates to accept public funds. Essentially, in return for strictly complying with the requirements of the public financing statute (including overall expenditure limitations), a publicly funded candidate is entitled to free advertising time on Rhode Island Public Television and Community Antenna Television ("CATV"), and is allowed to accept aggregate contributions of $2,000 (as opposed to $1,000) from individual sources in a calendar year. Specifically, Section 17–25–30 provides:

Any candidate eligible to receive public funds who shall comply in full with all eligibility criteria for receipt of such funds shall be:

(1) entitled to an additional benefit of free time on community antenna television to be allocated pursuant to rules determined by the administrator for the division of public utilities. During all such allocated free time the candidate shall personally appear and present the message of the advertisement;

(2) entitled to an additional benefit of free time on any public broadcasting station operating under the jurisdiction of the Rhode Island public telecommunications authority pursuant to rules determined by said authority. During all such allocated free time the candidate shall personally appear and present the message of the advertisement and;

(3) entitled to accept a contribution or contributions which in the aggregate do not exceed two thousand dollars ($2,000)

from any person or political action committee within a calendar year.

Plaintiff Elizabeth Leonard, a candidate in the 1992 election for Governor of Rhode Island who chose not to accept public financing for her campaign, challenges these incentive provisions. She argues that § 17–25–30 is unconstitutional under the First and Fourteenth Amendments because (1) it impermissibly penalizes the exercise of her First Amendment right not to participate in public financing, (2) it denies her and other candidates who choose not to accept public funds their equal protection rights, and (3) it bears no rational relationship to the prevention of corruption.[12] In addition, Leonard argues that the free television advertising provisions are preempted by Section 315 of the federal Communications Act, 47 U.S.C. § 315.

Defendants argue, initially, that Leonard lacks standing to challenge these provisions. In the alternative, they argue that, in the context of a voluntary public funding scheme, these incentives are a constitutionally valid allocation of public resources and do not implicate Leonard's First or Fourteenth Amendment rights. Finally, even if these incentives burden Leonard's rights, defendants claim they are narrowly tailored to serve compelling state interests.

### A. Standing

■ Defendants argue that plaintiff Leonard does not have standing to challenge these public financing incentives. They claim that she never actually faced a publicly financed opponent in the general election, and thus suffered no actual harm because of the statute.

The determination of whether a party has standing to challenge a statute is governed by "a blend of constitutional requirements and prudential considerations." *Valley Forge Christian College v. Americans United For Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). According to the Supreme Court:

No broadcasters have been added as plaintiffs in the suit, and the other plaintiffs have no standing to challenge the effect of the statute upon broadcasters.

---

**12.** Leonard also alleges that the free television provisions impermissibly burden the free speech rights of broadcasters. I note for the sake of clarity that this claim cannot be litigated here.

[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," (citation omitted), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision" (citation omitted). 454 U.S. at 472[, 102 S.Ct. at 758.]

Without belaboring the point, I find that Leonard easily satisfies these requirements. First, she was required by the State, at the very outset of her campaign, to declare irrevocably whether or not she would participate in public financing. She made this declaration knowing full well that her primary and/or general election opponents could choose to accept public funds, and thus receive fund raising and free television advertising advantages.

Defendants argue that because Leonard never had to compete with a publicly funded candidate, she has suffered no actual injury traceable to the statute. But the mere happenstance that no participating candidate was able to secure the nomination of their party or otherwise qualify for public funding does not alter the indisputable fact that Leonard was subject to the finance law as a candidate for Governor and was required to make a choice that colored her campaign strategy from the outset.

■■■ The prudential principles that must be considered in determining standing are (1) the party must assert his own legal rights or interests, (2) abstract questions amounting to generalized grievances are not sufficient to provide standing, and (3) the complaint must be arguably within the zone of interests to be protected by the constitutional guarantee in question. *Valley Forge*, 454 U.S. at 474–75, 102 S.Ct. at 759–60. Leonard satisfies these requirements as well. First, as of the commencement of this suit, she was asserting her own legal rights as a candidate for Governor.[13] Second, the question she presents is not a generalized grievance, but a particularized question regarding the constitutionality of incentives for publicly financed candidates. Third, Leonard's complaint is certainly within the zone of interests protected by the Fourteenth Amendment's guarantee of equal protection of the laws.

Finally, I note that a long line of election law standing cases have held that a candidate or party need only be subject to election law requirements in order to have standing to challenge them. *See, e.g., Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (independent presidential and vice-presidential candidates had standing to challenge California's restrictions on independent candidate ballot access, even though they had not filed any petitions to be placed on the ballot); *Erum v. Cayetano,* 881 F.2d 689 (9th Cir.1989) (nonpartisan candidate for local office in Hawaii had standing to challenge the State's requirement that nonpartisan candidates receive 10% of the votes cast in the primary election in order to gain access to the general election ballot, even though that requirement was not what in fact had excluded him from the general election ballot); *Libertarian Party of Kentucky v. Ehrler,* 776 F.Supp. 1200 (E.D.Ky.1991) (Libertarian Party candidates had standing to challenge the constitutionality of Kentucky's requirements regarding the filing of nominating petitions, even though they had not filed any nominating petitions). Leonard was subject to the public financing law and, therefore, unquestionably has standing to challenge the provisions at issue.

### B. *Leonard's Constitutional Challenges*

■■■ Leonard's constitutional objections to § 17-25-30's incentive provisions are weak. She claims, at various points, that the incentives burden her First Amendment "right not to participate in public financing," and that they impermissibly "favor" publicly funded candidates over those who choose not to accept public monies. She offers little direct

---

**13.** In this regard, I note that while Leonard is no longer a candidate for Governor, her challenge fits within the exception to the mootness doctrine for cases that are capable of repetition, yet evading review. *See Democratic Party of the United States v. Wisconsin,* 450 U.S. 107, 115 n. 13, 101 S.Ct. 1010, 1015 n. 13, 67 L.Ed.2d 82 (1981); *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974).

case support for her allegations and fails to acknowledge the considerable burdens, including expenditure limits, imposed upon those candidates who accept public funds. In addition, Leonard does not address, in any detail, the two most important cases in the public funding area, *Buckley v. Valeo,* and *Republican Nat. Comm. v. Federal Election Com.,* 487 F.Supp. 280 (S.D.N.Y.) (three-judge court), *aff'd,* 445 U.S. 955, 100 S.Ct. 1639, 64 L.Ed.2d 231 (1980) (*"RNC"*).

In *Buckley,* the plaintiffs challenged a congressional plan to provide for the public funding of presidential campaigns.[14] They argued, among other things, that any scheme of public financing is inconsistent with the First Amendment, and that the scheme at issue invidiously discriminated against certain minor party interests in violation of the Due Process Clause of the Fifth Amendment. *Buckley,* 424 U.S. at 90, 96 S.Ct. at 668.

The *Buckley* Court rejected out of hand the plaintiffs' First Amendment challenge. Plaintiffs' had argued that public financing of campaigns was akin to government aid to one religion over another in violation of the Establishment Clause. The Court dismissed the analogy as "patently inappropriate," stating:

> Although "Congress shall make no law . . . abridging the freedom of speech or of the press," [the public financing scheme] is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people. Thus, [the public financing scheme] furthers, not abridges, pertinent First Amendment values. *Buckley,* 424 U.S. at 91–92[, 96 S.Ct. at 669] (footnotes omitted).

In *RNC,* a subsequent challenge to the presidential public funding scheme, a three-judge district court re-affirmed the Supreme Court's view that public financing furthers

First Amendment interests. *RNC,* 487 F.Supp. 280, 285. The *RNC* panel stated:

> The Fund Act merely provides a presidential candidate with an *additional* funding alternative which he or she would not otherwise have and does not deprive the candidate of other methods of funding which may be thought to provide greater or more effective exercise of rights of communication or association than would public financing. Since the candidate remains free to choose between funding alternatives, he or she will opt for public funding only if, in the candidate's view, it will *enhance* the candidate's powers of communication and association. . . . Even if we accepted [plaintiffs'] claim that they are in practice compelled to opt for public funding, its effect would be to facilitate and enlarge their exercise of free speech over what it would otherwise be rather than to inhibit or reduce their speaking power. *Id.* at 285 (emphasis in original).

*See also Weber v. Heaney,* 793 F.Supp. 1438, 1457 (D.Minn.1992) ("The First Amendment is not implicated where candidates remain free to choose between funding alternatives.").

The Courts in both *Buckley* and *RNC* found no significant infringement on First Amendment rights of candidates. They also found that public financing serves multiple and significant state interests. In *Buckley,* the Supreme Court noted:

> It cannot be gainsaid that public financing as a means of eliminating the improper influence of large private contributions furthers a significant governmental interest. . . . *Buckley,* 424 U.S. at 96[, 96 S.Ct. at 671.]

In *RNC,* the court expanded on this finding:

> Moreover, even if there were some burden on the First Amendment rights of the candidate, the statutory scheme is supported by a compelling state interest. The goals of Congress—"to reduce the deleterious influence of large contributions on our

14. The Rhode Island public financing scheme is comparable to that used for presidential primary elections. *Compare* R.I.G.L. § 17-25-19 *with* 26 U.S.C. § 9031 *et seq.* Under the presidential primary scheme, in return for complying with

expenditure limits, qualifying presidential candidates receive federal matching funds for the first $250 they receive from each contributor, up to one half of the applicable spending limit for the primary race. 26 U.S.C. § 9034.

political process, to facilitate communications by candidates with the electorate, and to free candidates from the rigors of fundraising,"—represent significant state interests. *RNC,* 487 F.Supp. at 285.

Thus, *Buckley* and *RNC* provide strong support for defendants' contention in this case that the incentives of § 17–25–30 further, rather than abridge, First Amendment interests.

Instead of attacking the legitimacy of Rhode Island's public financing scheme in general, Leonard attempts to distinguish *Buckley* from the facts in this case. She argues that § 17–25–30's increased aggregate contribution and free television incentives are not legitimate aspects of the public funding scheme. *Buckley,* she contends, concerned itself uniquely with actual *public funding,* not the private fund raising and television incentives at issue here.[15] Furthermore, these incentives manipulate private fund raising with the object of forcing candidates to accept public financing who would otherwise choose not to do so. Nothing in *Buckley,* she maintains, sanctions measures like these which go outside the bounds of public funding. Finally, Leonard contends that the higher aggregate contribution limit does not actually serve the government's interest in preventing corruption, as a contribution of $2,000 per individual is surely more corrupting than a $1,000 contribution.

Leonard's argument that the higher contribution limit incentive provision does not legitimately allocate "public" funds, but instead "manipulates" private money cannot prevail. The Supreme Court has approved different contribution limits to candidates for individuals and PACs, according to their potential for corrupting the electoral process. *See Buckley,* 424 U.S. at 29, 35–36, 96 S.Ct. at 639, 642–43 (approving $1,000 individual contribution limit to candidates, and $5,000 contribution limit for political committees). Thus, the State may reasonably determine that, in light of the expenditure limits and other restrictions imposed upon publicly funded candidates, a $2,000 contribution limit does not pose undue risks of corruption. Moreover, Leonard has failed to demonstrate why the State's choice to allocate free television time and provide higher contribution limits differs, in any constitutionally significant respect, from the outright grants of public funds approved in *Buckley.* If anything, in the context of Rhode Island's voluntary public financing scheme, these incentive provisions further, rather than burden, First Amendment values.

■  Leonard's Equal Protection challenge is similarly foreclosed by *Buckley.* The *Buckley* Court rejected an equal protection challenge to the presidential campaign funding scheme brought by minor party candidates who not only were disadvantaged as compared to publicly funded major party opponents, but who were denied participation in the scheme altogether. The Court stated initially that "restrictions on access to the electoral process must survive exacting scrutiny." 424 U.S. at 94, 96 S.Ct. at 670. It then noted that a restriction can be sustained "only if it furthers a 'vital' governmental interest, [ ], that is 'achieved by a means that does not unfairly or unnecessarily burden either a minority party's or an individual candidate's equally important interest in the continued availability of political opportunity.'" *Id.* (citations omitted). The Court distinguished this standard, however, as applying to cases dealing primarily with ballot *access* issues. In the public financing realm, the Court stated:

> Any disadvantage suffered by operation of the eligibility formulae under the [presidential public funding statute] is ... limited to the claimed denial of the enhancement of opportunity to communicate with the electorate that the formulae afford eligible candidates. But eligible candidates suffer a countervailing denial. As we more fully develop later, acceptance of public financing entails voluntary acceptance of an expenditure ceiling. Noneligible candidates are not subject to that limitation.

15.  In this regard, Leonard notes that the presidential public funding scheme approved in *Buckley* authorizes only distributions of federal tax dollars in the form of matching funds and outright grants. The federal program does not include any differential treatment of presidential candidates with respect to private contribution limits or television advertising time.

424 U.S. at 95[, 96 S.Ct. at 671] (footnote omitted).

Finally, the Court concluded that public financing is generally less restrictive of access to the electoral process than ballot access regulations and that, "[i]n any event, Congress enacted [public financing for presidential campaigns] in furtherance of sufficiently important governmental interests and has not unfairly or unnecessarily burdened the opportunity of any party or candidate." *Id.*

In the context of Rhode Island's voluntary public financing scheme, the aggregate contribution and free television measures do not, in any way, "unfairly or unnecessarily burden" Leonard's interest in the availability of political opportunity. *See Buckley*, 424 U.S. at 94, 96 S.Ct. at 670. She, and all other candidates, can always opt in to public financing if they believe the benefits outweigh the burdens. Moreover, the incentive provisions merely assist in the implementation of the State's voluntary funding alternative, and directly promote the State's significant interests in deterring corruption, reducing campaign spending, and relieving candidates of the rigors of fund raising.

Notwithstanding this finding, I must concede that Leonard raises legitimate "slippery slope" concerns. To what extent may the State offer "incentives" to achieve its admittedly legitimate ends? At what point do those incentives to participate in public funding operate in such a way as to defeat the achievement of the State's proposed objectives? For example, Chairman Di Stefano testified at trial that he saw no problem with raising the $2,000 aggregate contribution limit for publicly funded candidates to $5,000 or $10,000 or more, in order to "encourage" participation. Even the *Buckley* Court noted the possibility that subsidy provisions could be unconstitutional as applied if they entailed excessive government entanglement with the mostly private political process. 424 U.S. at 93 n. 126, 96 S.Ct. at 669 n. 126. Leonard has failed, however, to justify such concerns in the context of the public funding incentives challenged here.

### V. Federal Preemption of §§ 17–25–30(1) and (2)

R.I.G.L. § 17–25–30(1) provides publicly funded candidates with free advertising time on community antenna television or CATV.[16] Section 17–25–30(2) requires "any public broadcasting station operating under the authority of the Rhode Island public telecommunications authority" to provide free air time to publicly funded candidates.[17] Leonard alleges that these provisions conflict with, and are preempted by, Section 315 of the federal Communications Act, 47 U.S.C. § 315.

Section 315 is a critical requirement of the Communications Act with respect to political campaigns. It provides:

> If any licensee shall permit any person who is a legally qualified candidate for public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station ...

While this section does not *require* that a broadcaster provide access to any candidate,

> it does mandate parity for all candidates for a given office once access by one is permitted. The duty is thus no more or less than to accord equal treatment to all legally qualified candidates for the same public office, and "equal opportunity" encompasses such elements as hour of the day, duration, and charges. *Kennedy for President Comm. v. FCC*, 636 F.2d 432, 438 (D.C.Cir.1980).

---

**16.** CATV is regulated under Rhode Island law by the Division of Public Utilities and Carriers ("DPUC"). R.I.G.L. § 39–19–6. Under the Division's regulations and the applicable franchise agreements, one or more CATV channels are dedicated by cable operators to the State for use in providing public access to cable television in furtherance of State policy. *See* DPUC, Rules Governing Community Antenna Television Systems (Rev. Jan. 14, 1983), § 14.1.

**17.** The Rhode Island Public Telecommunications Authority is established by R.I.G.L. § 16–61–2 as a public corporation empowered to hold property and licenses in trust for the State. Under R.I.G.L. § 16–61–6, the Authority is to "establish, own and operate" public broadcasting in the State, and to "apply for, receive and hold" the necessary licenses from the FCC. The Authority is also given responsibility over programming on the public television station. R.I.G.L. § 16–61–6(h).

*See also Paulsen v. FCC,* 491 F.2d 887, 889 (9th Cir.1974); *FCC v. Summa Corp.,* 447 F.Supp. 923, 926–27 (D.Nev.1978) (broadcaster who allows candidate to make an appearance, even if brief and perfunctory, violates equal opportunity statute if similar opportunity to appear is denied to his opponent).

The State of Rhode Island owns or controls the broadcasting facilities required to provide free television time under § 17–25–30(1) and (2). While the State may provide access to broadcasting facilities that it owns or controls, it cannot ignore its obligations as a licensee subject to the requirements of the federal Communications Act, 47 U.S.C. §§ 301 *et seq.*[18] As a licensee, the State and its instrumentalities must comply with their statutory obligations under Section 315.

Citing the maxim of statutory construction which provides that mention of one thing in a statute implies the exclusion of another, Leonard urges this Court to interpret § 17–25–30's specific grant of television time to publicly financed candidates as necessarily *excluding* those who do not accept public funds from receiving the benefit. *See De Sisto College Inc. v. Howey-in-the-Hills,* 706 F.Supp. 1479, 1495 (D.Fla.1989); *Murphy v. Murphy,* 471 A.2d 619, 622 (R.I.1984). If that were not the case, Leonard queries, what would be the "incentive" of the statute? So interpreted, the provisions would clearly conflict with § 315's statutory requirement of equal opportunity for qualified candidates. 47 U.S.C. § 315.

Common Cause counters this argument with its own candidate from the statutory construction arsenal: "[w]here two statutes are capable of co-existence, it is the duty of the courts ... to regard each as effective." *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 155, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976); *see also Hellon & Assoc., Inc. v. Phoenix Resort Corp.,* 958 F.2d 295, 297 (9th Cir.1992) ("[T]o the extent that statutes can be harmonized, they should be...."). According to Common Cause, there is no actual inconsistency between Section 315 and the free advertising provisions. The State/licensee may legitimately allocate free time to publicly funded candidates, so long as it complies with its obligations under Section 315. In other words, while §§ 17–25–30(1) and (2) provide free advertising time to publicly funded candidates, non-publicly funded candidates will be able to petition for equal time under Section 315 and, if denied, can seek redress through administrative enforcement proceedings at the Federal Communications Commission. *See* 47 CFR §§ 1.711–1.734; 69 FCC2d 2209, 2213 (1978) (describing how to file an administrative complaint to enforce Section 315).

As amici suggest, the free advertising provisions, on their face, do not appear to conflict with Section 315's requirement of equal time. When read together, in fact, the statutes appear to open up State owned or controlled media resources to both publicly funded and non-publicly funded candidates alike. Nothing in the plain language of § 315 or of the free television provisions themselves prohibits this result. I might also note that this result serves to further the State's goal of reducing campaign costs and broadening political debate. Because the free television provisions can be interpreted consistently with § 315, I reject plaintiff Leonard's federal preemption claim.

### VI. Conclusion

The spiralling costs of campaigning for political office, the potential for inappropriate influence by large contributors, and the growing public concern over the campaign finance process, all warrant the Rhode Island General Assembly's vigilant attention. The State should continue to consider creative means for combatting activities that threaten to undermine the electoral process. In light of the vital constitutional interests in political association and expression at stake, however, the State must temper its vigilance with circumspection.

In the absence of a documented threat of PAC misuse, Rhode Island's first dollar disclosure measure does not reflect sufficient

---

18. I note that neither plaintiffs or amici appear to dispute that the State, in owning and operating Rhode Island public television, and in controlling access to CATV, is subject to regulation as a licensee under the Communications Act.

sensitivity to plaintiffs' interests in expression and association.

For the reasons stated above, I find that:

(A) the first dollar public disclosure requirements of R.I.G.L. § 17–25–15(c)(1) impermissibly infringe upon plaintiffs' constitutional rights under the First and Fourteenth Amendments;

(B) the provisions of R.I.G.L. § 17–25–30, granting a higher aggregate contribution limit and free television advertising time to publicly-funded candidates do not violate either the First or the Fourteenth Amendments; and

(C) the provisions of §§ 17–25–30(1) and (2), allowing free television advertising time to publicly-funded candidates are consistent with, and not preempted by, § 315 of the federal Communications Act, 47 U.S.C. § 315.

In light of these findings, I hereby permanently enjoin defendants from enforcing the first dollar disclosure provision of R.I.G.L. § 17–25–15(c)(1). Furthermore, I modify my permanent injunction with respect to the enforcement of R.I.G.L. §§ 17–25–10.1(j) to enjoin enforcement only of that aspect of § 17–25–10.1(j) that prohibits corporations from making any independent *expenditures* with respect to ballot questions. Thus, corporations such as plaintiffs ACLU and Hasbro continue to be subject to § 17–25–10.1(j)'s general prohibition on corporate contributions to candidates, PACs (including PACs that advocate positions on ballot questions), and political parties, and its ban on independent corporate expenditures with respect to candidates, PACs and political parties.

Finally, I dismiss all plaintiffs' claims with respect to § 17–25–10(a)(3).

SO ORDERED.