September 28, 1993
UNITED STATES COURT OF APPEALS

FOR THE FIRST CIRCUIT

No. 93-1171
VOTE CHOICE, INC., ET AL.,
Plaintiffs, Appellees,

v.

JOSEPH DiSTEFANO, ETC., ET AL.,
Defendants, Appellees.

ELIZABETH LEONARD,
Plaintiff, Appellant.

No. 93-1236
VOTE CHOICE, INC., ET AL.,
Plaintiffs, Appellees,

v.

JOSEPH DiSTEFANO, ETC., ET AL.,
Defendants, Appellants.

ERRATA SHEET ERRATA SHEET

The order of the court issued on August 31, 1993 is
corrected as follows:

On page 24, lines 14, 15 and 16 replace the cite to
"Adams v. Watson, . . . slip op. at 7 n.8]." with "Association of
Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970)." 

[SYSTEMS NOTE: Appendix available at Clerk's Office]
August 31, 1993 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1171
VOTE CHOICE, INC., ET AL.,
Plaintiffs, Appellees,

v.

JOSEPH DiSTEFANO, ETC., ET AL.,
Defendants, Appellees,

ELIZABETH LEONARD,
Plaintiff, Appellant.

No. 93-1236

VOTE CHOICE, INC., ET AL.,
Plaintiffs, Appellees,

v.

JOSEPH DiSTEFANO, ETC., ET AL.,
Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Raymond J. Pettine, Senior U.S. District Judge]

Before

Selya, Cyr and Boudin, Circuit Judges.

Neal J. McNamara, with whom Matthew F. Medeiros was on
brief, for plaintiff Elizabeth Leonard (No. 93-1171) and for
plaintiffs-appellees (No. 93-1236).
Donald J. Simon, with whom Sonosky, Chambers, Sachse &
Endreson was on brief for Common Cause and Common Cause of R.I.,
amici curiae (No. 93-1171).
Anthony J. Bucci, Jr., with whom Licht & Semonoff was on
brief, for defendants Joseph DiStefano, et al.
Donald J. Simon, with whom Sonosky, Chambers, Sachse &
Endreson, Roger M. Witten, Carol F. Lee, W. Hardy Callcott, Eric
J. Mogilnicki, and Wilmer, Cutler & Pickering were on brief, for
Common Cause and Common Cause of R.I., amici curiae (No. 93-
1236).



SELYA, Circuit Judge. These consolidated appeals, SELYA, Circuit Judge.

which implicate various aspects of Rhode Island's campaign

finance law, necessitate the exploration of largely uncharted

constitutional terrain. One appeal, prosecuted on behalf of the

state, seeks to reinstate a statute requiring certain political

action committees (PACs)1 to disclose information about all

their contributors. The other appeal, prosecuted by an

unsuccessful gubernatorial candidate, Elizabeth Leonard, inveighs

against state statutes that bestow special advantages on

candidates who comply with eligibility requirements for public

campaign financing. At the end of our journey across terra

incognita, we conclude that the district court acted

appropriately both in striking down the first dollar disclosure

requirement and in upholding the incentive provisions.

Therefore, we affirm.

I. BACKGROUND I. BACKGROUND

Before addressing the merits, we offer an overview of

Rhode Island's campaign finance law and a brief synopsis of the

proceedings below. In so doing, we strive to place each

challenged provision in its overall statutory context and to


1Rhode Island law defines a PAC as

any group of two (2) or more persons which
accepts any contributions to be used for
advocating the election or defeat of any
candidate or candidates or to be used for
advocating the approval or rejection of any
question or questions submitted to the
voters.

R.I. Gen. Laws 17-25-3(j) (Supp. 1992).

3

describe the nature of the disagreement surrounding it.

A. Statutory Framework: The State's Appeal. A. Statutory Framework: The State's Appeal.

Rhode Island has a set of laws regulating the financing

of state and local election campaigns. See R.I. Gen. Laws 17-

25-1 to 17-25-30.1 (1988 & Supp. 1992). The entity charged with

primary responsibility for implementing these laws is the Rhode

Island Board of Elections. See id. at 17-25-5.

Rhode Island law directs all PACs and candidates to

file reports with the Board of Elections at regular intervals.

See id. at 17-25-11. The Board then "prepare[s] and make[s]

available for public inspection . . . summaries of all reports."

Id. at 17-25-5(a)(4). The reports are to include the name,

address, and place of employment of every person or entity

contributing more than $100 to the reporting PAC or candidate.

See id. at 17-25-7.

In 1992, the Rhode Island General Assembly, desirous of

ensuring that the voting public possesses accurate information

about organizations whose contributions and expenditures may

influence elections, devised extra reporting obligations for

PACs. Every PAC now must file a notice listing its goals and

purposes, the positions it plans to advocate on ballot questions,

the names of any candidates it intends to support, and the names

and addresses of its officers. See id. at 17-25-15(a).

Moreover, every PAC must report the name and address of all

persons to whom it makes expenditures, indicating the amount and

purpose of each such payment. See id. at 17-25-15(c)(2). The

4

Board of Elections is empowered to halt PACs from using names

which are misleading or which do not accurately identify a

committee's membership and contributor base. See id. at 17-25-

15(d).

Under the neoteric amendments, PACs must also "include

in each report required to be filed . . . [t]he source and amount

of all funds received." Id. at 17-25-15(c)(1). This added

requirement of "first dollar disclosure" the duty to disclose

the identity of, and the amount given by, every contributor, no

matter how modest the contribution applies to most PACs, but

does not apply in the same way to PACs sponsored by labor unions

or those which are funded through payroll checkoff plans. See

id. The requirement does not apply to candidates at all.

B. Statutory Framework: Leonard's Appeal. B. Statutory Framework: Leonard's Appeal.

In addition to regulating campaign contributions, Rhode

Island also affords public funding to gubernatorial candidates.2

See id. at 17-25-18. Candidates may elect whether or not to

accept such funds. See, e.g., id. at 17-25-19. If a candidate

elects to participate, and meets the law's eligibility

requirements,3 the state will match money raised from private



2From and after January 1, 1993, candidates for certain
other statewide offices are also eligible to receive public
funding. See R.I. Gen. Laws 17-25-20. Withal, because
Leonard's appeal arises in the context of the 1992 elections, we
limit our discussion to gubernatorial candidates.

3The eligibility criteria are set forth in R.I. Gen. Laws
17-25-20. We attach a statutory appendix that includes key
provisions of Rhode Island's campaign finance law as they stood
in the time frame of the 1992 elections.

5

sources up to a maximum of $750,000. See id. In return, the

state requires participants to observe certain restrictions on

campaign spending and related activities.

A candidate must signify a desire to use public funds

for campaign purposes upon formally declaring his or her

candidacy for office.4 See id. A candidate choosing this

option must sign a sworn statement pledging to comply with the

various terms and conditions of the grant. See id. at 17-25-

20(1). Once made or omitted, the election and pledge are

irrevocable. See id. at 17-25-19, 17-25-20(1). Thereafter, a

participating candidate must meet the law's threshold

requirements, limit the use of public funds received to certain



4Under Rhode Island law, persons seeking state elective
office must file formal declarations of candidacy in June of the
year in which the election is to be held. See R.I. Gen. Laws 
17-14-1. For purposes of the campaign finance act, however, a
person may be considered a candidate at an earlier time:

The term "candidate" means any
individual who undertakes any action, whether
preliminary or final, which is necessary
under the law to qualify for nomination for
election, or election to public office,
and/or any individual who receives a
contribution or makes an expenditure or gives
his or her consent for any other person to
receive a contribution or make an expenditure
with a view to bringing about his or her
nomination or election to any public office,
whether or not the specific public office for
which he or she will seek nomination or
election is known at the time the
contribution is received or the expenditure
is made and whether or not he or she has
announced his or her candidacy or filed a
declaration of candidacy at that time.

R.I. Gen. Laws 17-25-3(a).

6

enumerated purposes, compare R.I. Gen. Laws 17-25-20(7) & (8)

(listing permissible uses) with id. at 17-25-7.2 (describing

permissible uses of privately raised funds), abide by overall

expenditure ceilings and fundraising caps,5 see, e.g., id. at 

17-25-20(2), and return a percentage of any unexpended funds.

See id. at 17-25-25.

To make the offer of public financing more attractive

and thereby increase participation, the 1992 amendments included

a contribution cap gap. A candidate can ordinarily receive up to

$1,000 from any given person or PAC in a single calendar year.

See id. at 17-25-10.1. The amendment doubled this limit for

publicly funded candidates, see id. at 17-25-30(3), and, in the

bargain, created a cap gap between privately and publicly funded

candidates. At the same time, the legislature ordained that

candidates who comply with the eligibility criteria for public

financing would be

[e]ntitled to an additional benefit of free
time on community antenna television to be
allocat[ed] pursuant to rules determined by
the administrator for the division of public
utilities.

Id.; see also id. at 17-25-30.1 (obligating state public

utilities administrator to formulate relevant rules). Such

candidates are also entitled to "free time on any public



5A publicly financed candidate may exceed these limits if a
privately funded opponent exceeds them. See R.I. Gen. Laws 
17-25-24. Nevertheless, the publicly financed candidate
confronts a temporal impediment; he or she may raise additional
money only in proportion to the amount already expended by a
privately funded opponent. See id.

7

broadcasting station operating under the jurisdiction of the

Rhode Island public telecommunications authority." Id. at 17-

25-30(2).

C. Proceedings Below. C. Proceedings Below.

Two PACs (Vote Choice and Gun Owners PAC), certain

individuals who wish to contribute anonymously to each, and the

Rhode Island affiliate of the American Civil Liberties Union

brought suit in the district court seeking to enjoin the Board of

Elections from enforcing R.I. Gen. Laws 17-25-15(c)(1). They

posited that the provision self-destructed on three separate

bases, viz., (1) the first amendment bars any attempt to mandate

first dollar disclosure of political contributors' identities;

(2) Rhode Island's first dollar disclosure law, when placed in

its statutory context, places an impermissible burden on

associational rights; and (3) the proviso denies the plaintiffs

equal protection. The Board and two amici, Common Cause and

Common Cause of Rhode Island, eventually took up the cudgels in

defense.

In the same complaint, Leonard sought to enjoin the

Board of Elections, the Rhode Island Division of Public

Utilities, and the Rhode Island Public Telecommunications

Authority from implementing the contribution cap gap and the

free-television-time incentive provisions.6 She argued that



6The chief executive officer of each entity, sued in his
official capacity, is a named defendant. Clearly, however, the
state is the real party in interest. We treat the appeals
accordingly.

8

these enactments violate the first amendment in a variety of

ways, and, moreover, that federal law, specifically 47 U.S.C.

315 (1988), preempts the statutory grant of free television time.

The state resisted these exhortations on the merits and also

contended that Leonard lacked standing because she did not face a

publicly funded opponent in the general election.7 The amici

supported the state's position.

The district court merged the hearing on preliminary

injunction with trial on the merits. See Fed. R. Civ. P.

65(a)(2). After taking testimony, the court held first dollar

disclosure, in and of itself, to be unconstitutional and

invalidated R.I. Gen. Laws 17-25-15(c)(1) on that basis. See

Vote Choice v. DiStefano, 814 F. Supp. 195, 199-202 (D.R.I.

1993). The court also ruled that, although Leonard had standing

to mount a constitutional challenge, id. at 204, her contentions

were impuissant. See id. at 207. The Board appeals from the

district court's nullification of the first dollar disclosure

rule and Leonard appeals from the court's refusal to outlaw the

contribution cap gap and the free-television-time incentives.

II. THE STATE'S APPEAL II. THE STATE'S APPEAL

The first amendment is incorporated into the fourteenth

amendment and, in that way, constrains state action. See New

York Times Co. v. Sullivan, 376 U.S. 254, 276-77 (1964) (ruling


7Leonard sought the Republican nomination for governor
without party endorsement. She prevailed in the primary election
and carried the party's standard in the general election. She
did not opt for public funding. Her opponent in the general
election, Governor Sundlun, likewise eschewed public funding.

9

that the free speech clause applies to the states through the

fourteenth amendment; collecting cases). Accordingly, our

consideration of R.I. Gen. Laws 17-25-15(c)(1) starts with a

discussion of whether first dollar disclosure provisions are

always repugnant to the first amendment. Concluding (contrary to

the court below) that they are not, we then examine whether the

particular first dollar disclosure provision here at issue passes

the test of constitutionality.

A. The Per Se Challenge. A. The Per Se Challenge.

The district court struck down R.I. Gen. Laws 17-25-

15(c)(1) as per se violative of the first amendment, concluding

that a state legislature "must establish at least some [non-zero]

minimum threshold for public disclosure of contributions to

PACs." Vote Choice, 814 F. Supp. at 202. Because this holding

deals with a matter of law rather than fact it rests squarely

on the district court's sculpting of the first amendment's

contours our review is plenary. See LeBlanc v. B.G.T. Corp.,

992 F.2d 394, 396 (1st Cir. 1993).

It is old hat that compelled disclosure of information

about a person's political contributions "can seriously infringe

on [the] privacy of association and belief guaranteed by the

First Amendment." Buckley v. Valeo, 424 U.S. 1, 64 (1976) (per

curiam) (collecting cases). Thus, courts routinely subject

statutes mandating revelation of contributors' identities in the

arena of political speech to exacting scrutiny. See, e.g.,

Gibson v. Florida Legislative Investigation Comm., 372 U.S. 539,

10

546 (1963). A disclosure statute may survive such scrutiny only

if it satisfies a two-part test: (1) the statute as a whole must

serve a compelling governmental interest, and (2) a substantial

nexus must exist between the served interest and the information

to be revealed. See Brown v. Socialist Workers '74 Campaign

Comm., 459 U.S. 87, 91-92 (1982); Buckley, 424 U.S. at 64.

With respect to the test's first prong, no fewer than

three governmental interests have proven sufficient, in varying

circumstances, to justify obligatory disclosure of contribution-

related information. Thus, forced disclosure may be warranted

when the spotlighted information enhances voters' knowledge about

a candidate's possible allegiances and interests, inhibits actual

and apparent corruption by exposing large contributions to public

view, or aids state officials in enforcing contribution limits.

See Brown, 459 U.S. at 92; Buckley, 424 U.S. at 66-68. Because

R.I. Gen. Laws 17-25-15(c)(1), read as part of an integrated

whole, plainly satisfies this prong of the test indeed, the

Rhode Island statute appears to advance the three interests we

have mentioned in much the same fashion as did the statute before

the Buckley Court we proceed directly to the difficult question

of whether a substantial relationship exists between the precise

modicum of information required to be disclosed and some

compelling state interest.

We agree with the plaintiffs that, in certain respects,

the fit required to meet the test's second prong is lacking. As

the disclosure threshold drops toward zero, the bond between the

11

information revealed and the governmental interests involved

becomes weaker and, therefore, more tenuous. See, e.g., Buckley,

424 U.S. at 83-84. Common sense suggests that information about

the source of a $1 contribution does not advance the state's

interest in deterring actual or apparent corruption because such

a donation has a limited (perhaps nonexistent) potential to exact

an illegal or unethical quid pro quo. Similarly, such

information bears little discernible relation to the state's

interest in enforcing contribution limits that dip no lower than

$1,000: few persons will donate $1 to a PAC on more than 1,000

separate occasions and those that try will likely grow arm-

weary in the process.

But, viewed from another, equally proper, angle, the

fit is quite comfortable: signals are transmitted about a

candidate's positions and concerns not only by a contribution's

size but also by the contributor's identity. See Goland v.

United States, 903 F.2d 1247, 1261 (9th Cir. 1990); FEC v.

Furgatch, 807 F.2d 857, 862 (9th Cir.), cert. denied, 484 U.S.

850 (1987); see also First Nat'l Bank v. Bellotti, 435 U.S. 765,

791-92 & n.32 (1978) (discussing required disclosure of corporate

advertisers' names). Since the identity of a contributor is

itself informative, quite apart from the amount of the

contribution, a candidate's ideological interests may often be

discerned as clearly from a $1 contribution as from a $100

contribution. Hence, we conclude that there is a substantial

link between data revealed by first dollar disclosure and the

12

state's compelling interest in keeping the electorate informed

about which constituencies may command a candidate's loyalties.8

Buckley buttresses this conclusion. There, in

evaluating whether a $10 recordkeeping threshold and a $100

disclosure threshold passed constitutional review, the Court

admonished that decisions about "the appropriate level at which

to require recording and disclosure" are "necessarily . . .

judgmental" and, therefore, best left to legislative discretion.

Buckley, 424 U.S. at 83. Consequently, so long as legislatively

imposed limitations are not "wholly without rationality," courts

must defer to the legislative will. Id. We think that this

approach is fully transferable to the instant case. Because the

notion of first dollar disclosure is not entirely bereft of

rationality as we have already indicated, such a requirement

relates to at least one sufficiently cogent informational goal

any general embargo against first dollar disclosure statutes

would be inconsistent with the Buckley Court's insistence upon

judicial deference to plausible legislative judgments.

Nor does Buckley stand alone in support of the

conclusion that the Constitution does not prohibit all first



8In this respect, the goal of enhancing voter awareness
about the interests to which a candidate may be responsive is
separate and distinct from the goal of thwarting corruption. The
former is best served by compulsory disclosure of data about all
the various sorts of philosophical and ideological interests to
which a candidate may be sensitive while the latter is equally
well served by targeting a particular form of quid pro quo
"responsiveness." See generally Buckley, 424 U.S. at 66-68.
While first dollar disclosure furthers the former goal, it does
not meaningfully advance the latter goal.

13

dollar disclosure statutes. Other trail markers, like spoor for

the cognoscenti, lead in the same direction. See, e.g., Brown,

459 U.S. at 89 & n.2 (specifically noting that a statute mandated

first dollar disclosure, yet failing to identify any potential

constitutional infirmity); Citizens Against Rent Control v. City

of Berkeley, 454 U.S. 290, 300 (1981) (stating that "if it is

thought wise, legislation can outlaw anonymous contributions")

(dictum); cf. California Bankers Ass'n v. Schultz, 416 U.S. 21,

55-56 (1974) (holding that the first amendment does not create a

per se rule forbidding disclosure of contributor names in all

situations); Oregon Socialist Workers 1974 Campaign Comm. v.

Paulus, 432 F. Supp. 1255, 1260 (D. Or. 1977) (three-judge court)

(upholding first dollar recordkeeping and partial public

disclosure threshold).

We hold that first dollar disclosure is not, in all

cases, constitutionally proscribed. Because the court below

struck down R.I. Gen. Laws 17-25-15(c)(1) on this very ground

it said, in essence, that first dollar disclosure necessarily

leaves insufficient breathing room for first amendment freedoms,

see Vote Choice, 814 F. Supp. at 202 our consideration of the

statute's constitutionality must probe the plaintiffs' other

rationales. After all, a judgment, although arrived at by faulty

reasoning, still can be sustained on some other ground made

manifest by the record. See, e.g., Martel v. Stafford, 992 F.2d

1244, 1245 (1st Cir. 1993); Chongris v. Board of Appeals, 811

F.2d 36, 37 n.1 (1st Cir.), cert. denied, 403 U.S. 1021 (1987).

14

We turn, then, to the plaintiffs' next theory a theory that

shifts from an exclusive focus on whether first dollar disclosure

provisions are ever permissible to a more holistic focus on

whether Rhode Island's disclosure requirement, considered in

light of the state's overall campaign finance law, withstands

constitutional scrutiny.

B. The Contextual Challenge. B. The Contextual Challenge.

It is apodictic that courts, when passing upon the

constitutionality of a statutory provision, must view it in the

context of the whole statutory scheme. See Storer v. Brown, 415

U.S. 724, 737 (1974); Williams v. Rhodes, 393 U.S. 23, 34 (1968).

Here, plaintiffs' contextual challenge centers on the disparity

between the first dollar disclosure threshold applicable to those

who choose to pool money by making contributions to PACs and the

$100 disclosure threshold applicable to those who choose to act

alone by making direct contributions and expenditures. Compare

R.I. Gen. Laws 17-25-15(c)(1) with id. at 17-25-7.

Plaintiffs say that this disparity not only burdens PAC

contributors' first amendment rights of association but also

undermines Rhode Island's boast that first dollar disclosure of

PAC contributions represents a rationally selected device geared

toward achieving a compelling state interest. We find

plaintiffs' analysis to be convincing.

The first amendment frowns upon laws which burden

associational rights, particularly in the sphere of political

speech. The more lopsided the burdens, the more probable it is

15

that a constitutional infirmity looms. Thus, in Berkeley, the

Supreme Court struck down a limitation on contributions to PACs,

resting its holding not on the impermissibility of the limits per

se, but, rather, on the disparity between those limits and the

limits applicable to persons who, for one reason or another,

preferred not to pool their resources:

To place a Spartan limit or indeed any
limit on individuals wishing to band
together to advance their views on a ballot
measure, while placing none on individuals
acting alone, is clearly a restraint on the
right of association. [Laws which] do[] not
seek to mute the voice of one individual . .
. cannot be allowed to hobble the collective
expressions of a group.

Berkeley, 454 U.S. at 296.

We believe that this passage enunciates three

fundamental precepts. First, any law that burdens the rights of

individuals to come together for political purposes is suspect

and must be viewed warily. Second, burdens which fall

exclusively on those who choose to exercise their right to band

together, leaving individual speakers unbowed, merit heightened

scrutiny. Third, measures which hinder group efforts to make

independent expenditures in support of candidates or ballot

initiatives are particularly vulnerable to constitutional attack.

The first two precepts derive in part from the importance of

group expression as a method of amplifying the voices of those

with meager means. See FEC v. National Conservative Political

Action Comm., 470 U.S. 480, 493-94 (1985) (collecting cases);

Buckley, 424 U.S. at 65-66. The last precept derives in part

16

from the fact that independent expenditures, because they have a

more attenuated connection with a particular candidate, are a

less likely source for quid pro quo corruption and a questionable

indicator of candidate loyalties. See Buckley, 424 U.S. at 39

(noting that independent expenditures are "at the core of our

electoral process and of the First Amendment freedoms") (citation

and internal quotation marks omitted).

In Berkeley, these three precepts coalesced to scuttle

a contribution cap. See 454 U.S. at 296. The case at bar is a

fair congener. Here, as in Berkeley, the challenged enactment

hobbles collective expression by mandating that groups disclose

contributors' identities and the extent of their monetary

support, no matter how tiny. This, in itself, is a red flag.

See Buckley, 424 U.S. at 64 (observing that "compelled

disclosure, in itself, can seriously infringe on privacy of

association and belief"); id. at 83 (observing that

"[c]ontributors of relatively small amounts are likely to be

especially sensitive to recording or disclosure of their

political preferences"). Here, as in Berkeley, the statute has a

much less stringent rule for those who prefer individual

expression to collective expression. Here, as in Berkeley, the

statute imposes its one-sided burden regardless of whether a

group's members have banded together to contribute directly to a

candidate or to make independent expenditures concerning a

17

candidate or referendum.9 We think that these three points of

comparison accurately foretell that here, as in Berkeley, the

statute cannot stand.

The state strives valiantly to avoid the force of this

comparison. It says that, even if section 17-25-15(c)(1) burdens

associational rights to some moderate extent, the law

nevertheless merits enforcement under the rubric of legislative

prerogative. We disagree. While legislative judgments must be

given a wide berth, judicial deference should never be confused

with outright capitulation. Federal courts would abdicate their

constitutional responsibility if they were to rubber-stamp

whatever constructs a state legislative body might propose. And,

in any event, judicial deference to legislative line-drawing

diminishes when the lines are disconnected, crooked, or uneven.

So it is here: the Rhode Island General Assembly has made a

series of conflicting judgments about appropriate disclosure

thresholds without offering any legally satisfactory explanation

for its pererrations.

This zigging and zagging is of especial concern

because, when citizens engage in first amendment activity

affecting elections, the state's interest in disclosure is

generally a constant, that is, the state's interest "is the same

whether or not [the individual actors] are members of an



9Under Rhode Island law, PACs may form for the exclusive
purpose of promoting or opposing ballot questions. See R.I. Gen.
Laws 17-25-15(f). A PAC formed for such a purpose is subject
to the first dollar disclosure requirement.

18

association." Minnesota State Ethical Practices Bd. v. National

Rifle Ass'n, 761 F.2d 509, 513 (8th Cir. 1985), cert. denied, 474

U.S. 1082 (1986); see also New Jersey Citizens Action v. Edison

Township, 797 F.2d 1250, 1265 (3d Cir. 1986) (requiring that

government demonstrate a special risk stemming from a particular

form of first amendment activity in order to justify disclosure

requirements for that form of activity), cert. denied, 479 U.S.

1103 (1987). Rhode Island, in one fell swoop, not only departed

from the usual rule of constancy but also imported a particularly

virulent strain of unevenness into its statutory scheme: most

PACs must disclose the identity of every contributor, regardless

of amount, while individual candidates need disclose the

identities only of contributors who donate upwards of $100.

This imbalance does not cater to any cognizable

government interest. It does not serve the state's interest in

combatting corruption because corruption can as easily spring

from direct contributions to candidates as from contributions

that flow through PACs. And, if the danger that tiny

contributions will foment corruption is not great enough to

justify significant inroads on first amendment rights, see supra

Part II(A), it is certainly not great enough to justify disparate

treatment of PACs. Similarly, the unevenness does not serve the

state's interest in enforcing its contribution limits; after all,

the district court found no evidence that PAC contributors might

try to subvert the $1,000 cap by an endless stream of $1

donations. See Vote Choice, 814 F. Supp. at 202.

19

Finally, the interest in an informed citizenry cannot

justify the disparity at issue here. To be sure, when

contributors' identities are made public, the name of a PAC,

standing alone, could in some states have little meaning to a

large segment of the electorate. See California Medical Ass'n v.

FEC, 453 U.S. 182, 201 (1981) (observing that "entities hav[ing]

differing structures and purposes . . . may require different

forms of regulation in order to protect the integrity of the

electoral process"); see also Austin v. Michigan St. Chamber of

Commerce, 494 U.S. 652, 668 (1990); FEC v. National Right to Work

Comm., 459 U.S. 197, 210 (1982). But, Rhode Island has guarded

against this contingency by requiring that PACs reveal a wide

array of information about their goals and purposes. See R.I.

Gen. Laws 17-25-15(a); see also supra pp. 3-4. The obvious

result of Rhode Island's legislative mosaic is that when a

candidate discloses that a particular PAC has given to his or her

cause, state law ensures that this fact will signify more about

the candidate's loyalties than the disclosed identity of an

individual contributor will ordinarily convey. We think this

circumstance is properly considered, see Storer, 415 U.S. at 743

(explaining that other state requirements may be considered in

evaluating whether a disclosure requirement is sufficiently

essential to repel a constitutional challenge); see also

Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 637 &

n.11 (1980); Let's Help Fla. v. McCrary, 621 F.2d 195, 200-01

(5th Cir. 1980), aff'd mem., 454 U.S. 1130 (1982), and it weighs

20

heavily in our conclusion that the claimed justification for the

added (first dollar disclosure) burden that Rhode Island imposes

on PACs and PAC contributors is more illusory than real.

In sum, R.I. Gen. Laws 17-25-15(c)(1) has at least

three grave weaknesses. First, by mandating public revelation of

all PAC contributors, it burdens the rights of individuals to

band together for the purpose of making either independent

election expenditures or direct political contributions. Second,

by imposing this burden on PACs and PAC contributors while

regulating candidates and certain of their financial backers

(viz., individuals who contribute directly to candidates rather

than to PACs) more loosely, the statute compounds the unfairness

of the burden. Finally, the disparity between the two disclosure

thresholds (one for PACs and the other for individuals), and,

hence, the net burden imposed solely on associational rights,

bears no substantial relation to the attainment of any important

state interest. Their cumulative effect compels the conclusion

that the statute abridges the first amendment.10

We have one more stop to make before leaving this

subject. The amici invite us to limit any determination of



10In light of this determination, we need not address a
further statutory anomaly: that, while most PACs are held to
first dollar disclosure under Rhode Island law, a select group of
PACs enjoys preferential treatment. See R.I. Gen. Laws 17-25-
15(c)(1) (exempting PACs sponsored by labor unions and those
which are funded through payroll checkoff plans from first dollar
disclosure requirements). Similarly, because we decide that
Rhode Island's first dollar disclosure provision impermissibly
burdens the right to association, we need not determine whether
it also violates the equal protection clause.

21

unconstitutionality to the two plaintiff PACs. However, the

cases relied on by the amici, see, e.g., FEC v. Massachusetts

Citizens for Life, Inc., 479 U.S. 238 (1986); Brown, 459 U.S. 87,

involve explicit as-applied challenges to particular statutes.

Here, in contrast, plaintiffs mounted a facial attack on R.I.

Gen. Laws 17-25-15(c)(1) and the case proceeded below on this

theory. Moreover, the reason we invalidate the statute concerns

the disparate treatment of PACs qua PACs, and, thus, obtains with

equal vigor regardless of which particular PAC may be involved.

This is a salient consideration in determining what remedy is

appropriate, see, e.g., Sec'y of State v. Joseph H. Munson Co.,

467 U.S. 947, 967-68 (1984); City Council of Los Angeles v.

Taxpayers for Vincent, 466 U.S. 789, 799-800 (1984), as is the

fact that our reasoning does not derive its force from situation-

specific features. See, e.g., National Treas. Employees Union v.

United States, 990 F.2d 1271, 1277-78 (D.C. Cir. 1993). Finally,

only the amici have advocated the limitation-of-remedy position

and "[w]e know of no authority which allows an amicus to

interject into a case issues which the litigants, whatever their

reasons might be, have chosen to ignore." Lane v. First Nat'l

Bank, 871 F.2d 166, 175 (1st Cir. 1989); accord McCoy v.

Massachusetts Inst. of Technology, 950 F.2d 13, 23 n.9 (1st Cir.

1991), cert. denied, 112 S. Ct. 1939 (1992). For these reasons,

we decline the amici's invitation.11


11For many of the same reasons, we cannot employ the
statute's severability provision, R.I. Gen. Laws 17-25-17, to
rescue any portion of the first dollar disclosure.

22

To recapitulate, then, we reject both Rhode Island's

appeal and the amici's importuning that we apply a Band-Aid in

lieu of surgically excising the malignancy. Consequently, we

uphold the permanent injunction barring enforcement of R.I. Gen.

Laws 17-25-15(c)(1). In striking down the statute, however, we

take a narrower path than did the court below. As legislatures

must tread carefully in this complicated area, so, too, must

courts. We decline to rule out categorically the legislative

tool of first dollar disclosure; that tool may in certain

contexts although not here serve sufficiently compelling

government interests to be upheld.

III. LEONARD'S APPEAL III. LEONARD'S APPEAL

We have arrived at Leonard's appeal. Before addressing

the merits, we resolve the question of standing.

A. Standing. A. Standing.

Standing doctrine involves "a blend of constitutional

requirements and prudential considerations." Valley Forge

Christian Coll. v. Americans United for Separation of Church and

State, Inc., 454 U.S. 464, 471 (1982). On the constitutional

side, Article III limits federal court adjudication to matters

which achieve the stature of justiciable cases or controversies.

Ordinarily, this means that a party invoking the court's

authority must show: (1) that he or she has suffered some actual

or threatened injury as a result of the defendant's putatively

illegal conduct, (2) that the injury may fairly be traced to the

23

challenged action, and (3) that a favorable decision will likely

redress the injury. See Riverside v. McLaughlin, 111 S. Ct.

1661, 1667 (1991); Valley Forge, 454 U.S. at 472. We have

cautioned that "[t]he ingredients of standing are imprecise and

not easily susceptible to concrete definitions or mechanical

application." United States v. AVX Corp., 962 F.2d 108, 113 (1st

Cir. 1992).

When declaring her candidacy, Leonard had to make an

irrevocable commitment either to shun or to embrace public

financing. Leonard's testimony suggests that, having decided to

forgo the embrace, she had to structure her campaign to account

for her adversaries' potential receipt of television time,

fundraising advantages, and the like. Her opponent in the

Republican primary, Mayor Levesque, opted for public financing.

Leonard testified that Levesque accepted contributions over

$1,000 while she had to turn away similar contributions. What is

more, because one of the two major candidates in the Democratic

gubernatorial primary also opted for public funding, Leonard had

to plan for the possibility that a publicly financed candidate

would oppose her in the general election.

Based on this and other evidence, the district court's

finding that the coerced choice between public and private

financing "colored [Leonard's] campaign strategy from the

outset," Vote Choice, 814 F. Supp. at 204, seems unimpugnable.

In our view, such an impact on the strategy and conduct of an

office-seeker's political campaign constitutes an injury of a

24

kind sufficient to confer standing. See Buckley, 424 U.S. at 12

& n.10 (determining that standing existed in a case where certain

candidates challenged disparate rules and contribution caps);

Storer, 415 U.S. at 738 n.9 (noting that simply being subjected

to election law requirements, even indirectly, may constitute

cognizable injury); see also AVX Corp., 962 F.2d at 113-14

(defining "injury"). Therefore, Leonard satisfies the first

furculum of the test.

Leonard also possesses the remaining attributes of

constitutional standing. The injury she suffered can be traced

directly to the state's actions: the statutory provisions, and

the Board's implementation of them, caused the harm of which

Leonard complains. As to redressability, Leonard seeks a

permanent injunction against continued enforcement of the very

statutes which caused her injury. This produces the necessary

causal connection between the injury alleged and the relief

requested.12 See, e.g., Allen v. Wright, 468 U.S. 737, 753

n.19 (1984).

Over and above its constitutional requisites, "the


12The Board suggests that this causal link snapped once the
general election concluded, thereby rendering the case moot. We
disagree. There is a recognized exception to the mootness
doctrine for matters capable of repetition yet evading review.
This is such a case. The injury Leonard seeks to palliate was
too fleeting to be litigated fully prior to the climax of the
gubernatorial campaign and, since there is a reasonable
expectation that Leonard will encounter the same barrier again
after all, she has not renounced possible future candidacies, and
politicians, as a rule, are not easily discouraged in the pursuit
of high elective office the exception applies. See Democratic
Party of the U.S. v. Wisconsin, 450 U.S. 107, 115 n.13 (1981);
Bellotti, 435 U.S. at 774.

25

doctrine of standing also embodies prudential concerns regarding

the proper exercise of federal jurisdiction." AVX Corp., 962

F.2d at 114. Leonard's case qualifies on this score as well. In

the interest of expedition, we refer the reader who hungers for

detail to the district court's erudite discussion of this point.

See Vote Choice, 814 F. Supp. at 204. We add only that Leonard

is asserting her own rights and interests (not someone else's);

that her grievances are particularized and concrete; and that her

claim falls well within the zone of interests protected by the

first amendment. No more is exigible. See, e.g., Allen, 468

U.S. at 751; Warth v. Seldin, 422 U.S. 490, 499-500 (1975);

Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150,

153 (1970). Thus, Leonard has standing to pursue her quest.

B. The Contribution Cap Gap. B. The Contribution Cap Gap.

Leonard has questioned several different provisions of

the statute. We turn initially to her claim that the

contribution cap gap is inimical to the first amendment.13 In

reaching this issue, we stress that Leonard assails only the

disparity between the two caps; she voices no in vacuo challenge

to the $1,000 cap applicable to candidates, such as herself, who

eschew public funding.

Leonard's serenade has two themes. Her major theme is



13Under Rhode Island law, contributions to political
campaigns are customarily capped at $1,000 per donor. See R.I.
Gen. Laws 17-25-10.1. However, a candidate who qualifies for
public funds is entitled to receive contributions in amounts up
to $2,000 per donor. See id. at 17-25-30(3). This disparity
constitutes the contribution cap gap of which Leonard complains.

26

that regulatory disparities of this type are inherently

impermissible. Her minor theme is that the cap gap burdens her

first amendment rights without serving a corresponding

governmental interest. We consider these asseverations

sequentially, affording plenary review. See LeBlanc, 992 F.2d at

396.

1. The Per Se Challenge. Leonard's per se challenge 1. The Per Se Challenge.

to the contribution cap gap boils down to the assertion that,

whenever government constructs incentives for candidates to

accept fundraising limits, it departs from its required role as

an umpire and becomes a player in the electoral process, much

like, say, a referee who eases the rules for one team and not the

other. The most immediate barrier to the success of this

argument is that the Supreme Court has upheld a very direct and

tangible incentive: the provision of public funds to candidates

who agree to place decreased reliance on private campaign

contributions. See Buckley, 424 U.S. at 85-109; see also

Republican Nat'l Comm. v. FEC, 487 F. Supp. 280, 283-86

(S.D.N.Y.) (three-judge court) (RNC I), aff'd mem., 445 U.S. 955

(1980); Republican Nat'l Comm. v. FEC, 616 F.2d 1, 2 (2d Cir.)

(en banc) (adopting reasoning of RNC I in parallel proceeding),

aff'd mem., 445 U.S. 955 (1980).

In a Briarean effort to scale this barrier, Leonard

attempts to distinguish the public financing cases on the ground

that they involve the propriety of conferring benefits in

contrast to imposing penalties. She is fishing in an empty pond.

27

For one thing, the distinction that Leonard struggles to draw

between denying the carrot and striking with the stick is, in

many contexts, more semantic than substantive. This case

illustrates the point. The question whether Rhode Island's

system of public financing imposes a penalty on non-complying

candidates or, instead, confers a benefit on those who do comply

is a non-issue, roughly comparable to bickering over whether a

glass is half full or half empty. After all, there is nothing

inherently penal about a $1,000 contribution cap.

For another thing, to the degree that the question does

have a concrete answer, the answer appears contrary to the one

Leonard suggests. Leonard has adduced no legislative history or

other evidence suggestive of punitive purpose. Moreover, the

Rhode Island statute sets up a $1,000 cap as the norm and doubles

the cap only if a candidate meets certain conditions. Logic

suggests that the higher cap is, therefore, a premium earned by

meeting statutory eligibility requirements rather than a penalty

imposed on those who either cannot or will not satisfy the

requirements.

Third, the blurred line between benefit denials and

penalties is singularly unhelpful in the zero-sum world of

elective politics. Because a head-to-head election has a single

victor, any benefit conferred on one candidate is the effective

equivalent of a penalty imposed on all other aspirants for the

same office. In the last analysis, then, Leonard's fancied

distinction proves too much.

28

While these three reasons spell defeat for Leonard's

attempt to distinguish the public financing cases as different in

kind from this case, Leonard also proffers a difference-in-degree

distinction. Even if some regulatory incentives may be

permissible, she says, Rhode Island's incentives are so strong

that they destroy the voluntariness of the public financing

system and, therefore, cannot be condoned.

We agree with Leonard's main premise: voluntariness

has proven to be an important factor in judicial ratification of

government-sponsored campaign financing schemes. See, e.g.,

Buckley, 424 U.S. at 95; RNC I, 487 F. Supp. at 285. Coerced

compliance with fundraising caps and other eligibility

requirements would raise serious, perhaps fatal, objections to a

system like Rhode Island's. Furthermore, there is a point at

which regulatory incentives stray beyond the pale, creating

disparities so profound that they become impermissibly coercive.

It is, however, pellucid that no such compulsion occurred here.

Rhode Island's law achieves a rough proportionality

between the advantages available to complying candidates

(including the cap gap) and the restrictions that such candidates

must accept to receive these advantages.14 Put another way,


14Indeed, the specific facts of Rhode Island's 1992
gubernatorial contest support the conclusion that the state's
catalog of incentives is neither overly coercive nor even
especially attractive. Both Leonard and Governor Sundlun (who
prevailed in the Democratic primary and eventually won the
general election) resisted the temptations of public funding
despite facing (a) an opponent in the primary who had opted for
public funding and (b) a substantial possibility that the other
party's candidate in the general election would be receiving such

29

the state exacts a fair price from complying candidates in

exchange for receipt of the challenged benefits. While we agree

with Leonard that Rhode Island's statutory scheme is not in exact

balance we suspect that very few campaign financing schemes

ever achieve perfect equipoise we disagree with her claim that

the law is unfairly coercive. Where, as here, a non-complying

candidate suffers no more than "a countervailing denial," the

statute does not go too far. Buckley, 424 U.S. at 95.

To sum up, the implication of the public funding cases

is that the government may legitimately provide candidates with a

choice among different packages of benefits and regulatory

requirements. Rhode Island has done nothing more than implement

this principle. We see no sign that the state has crossed into

forbidden territory; the contribution cap gap, as structured by

the Rhode Island General Assembly, neither penalizes certain

classes of office-seekers nor coerces candidates into

surrendering their first amendment rights. In short, Leonard has

identified no inherent constitutional defect in the state's

voluntary, choice-increasing framework.

2. The Burden/Justification Matrix. Leonard keeps on 2. The Burden/Justification Matrix.

trucking. She asserts that, even if the cap gap does not

penalize or coerce, it nonetheless burdens her first amendment

rights without sufficient justification. The assertion stalls.

In the first place, we have difficulty believing that a

statutory framework which merely presents candidates with a


funds.

30

voluntary alternative to an otherwise applicable, assuredly

constitutional, financing option imposes any burden on first

amendment rights. In choosing between the ordinary methods of

financing a campaign methods which are themselves subject to

certain restrictions and the public funding alternative which

limits both fundraising and expenditures a candidate will

presumably select the option which enhances his or her powers of

communication and association. See Buckley, 424 U.S. at 92-93;

RNC I, 487 F. Supp. at 285. Thus, it seems likely that the

challenged statute furthers, rather than smothers, first

amendment values.

In the second place, even if the cap gap burdens a non-

complying candidate's first amendment rights to some small

extent, and assuming for argument's sake that the state bears the

devoir of persuasion in respect to whether the statutory

framework is both in service to a compelling governmental

interest and tailored in a sufficiently narrow manner, we would

still find Leonard's thesis unpersuasive. The state need not be

completely neutral on the matter of public financing of

elections. When, as now, the legislature has adopted a public

funding alternative, the state possesses a valid interest in

having candidates accept public financing because such programs

"facilitate communication by candidates with the electorate,"

Buckley, 424 U.S. at 91, free candidates from the pressures of

fundraising, see id., and, relatedly, tend to combat corruption.

See id.; see also RNC I, 487 F. Supp. at 285-86. Establishing

31

unequal contribution caps serves this multifaceted network of

interests by making it more probable that candidates will choose

to partake of public financing. Equally important, the gap

appears to reflect a carefully calibrated legislative choice

anent the differential risk of quid pro quo corruption in the two

instances. In the state's view, the many eligibility

requirements for public financing make it less likely that a

given contribution will tend to corrupt a candidate.15 That

view, too, is plausible. Ergo, the contribution cap gap stands

on reasonably solid theoretical footing.

For these reasons, we find Rhode Island's contribution

cap gap narrowly tailored and logically related, in scope, size,

and kind, to compelling governmental interests.16 That being



15To cite an example, once it is clear that a publicly
financed candidate's campaign can reach the overall fundraising
limits, see R.I. Gen. Laws 17-25-20(2), any single contributor
to that campaign becomes less important because the contributor
can be "replaced" at no marginal cost. In other words, the fact
that the campaign seems bound to reach the fundraising ceiling
means that a given contributor is occupying a contribution slot
that could as easily be occupied by someone else. With this
distinction in the importance of individual contributors comes a
corresponding diminution in the risk of corruption and,
therefore, a diminished justification for stringent contribution
limits. See, e.g., Buckley, 424 U.S. at 91, 96.

16We add a caveat. We do not in any way imply that the
contribution cap gap is constitutionally mandated. A state
legislature could certainly conclude that a $2,000 contributor to
a campaign complying with the spending limits actually holds a
greater sway with the candidate than does a $1,000 contributor to
an unlimited campaign because the former contribution represents,
in most cases, a greater percentage of the candidate's kitty than
does the latter. But, the legislature must have a certain amount
of operating room in this sphere. The first amendment does not
require the courts to choose sides, at this level of
particularity, in the flux and reflux of policy considerations.

32

so, it would be unduly meddlesome, hence, wrong, for us to

substitute our own assessment of either an incentive's value or

the perceived risks to which it is addressed for the considered

judgment of a state legislature. See Nat'l Right to Work, 459

U.S. at 210 (expressing reluctance to "second-guess a legislative

determination as to the need for prophylactic measures where

corruption is the evil feared"); Baker v. City of Concord, 916

F.2d 744, 750 (1st Cir. 1990) (discussing impropriety of federal

courts second-guessing a state's legislative judgments).

3. Recapitulation. We hold that states may sometimes 3. Recapitulation.

legitimately confront candidates with the option of choosing

among different packages of benefits and regulatory requirements.

We hold further that such a permissible choice occurs where, as

here, there is no credible evidence of a penalizing purpose, the

choice between the packages is real, uncoerced, and available to

all, the status quo option, standing alone, raises no red flags,

and the challenged disparity is narrowly tailored and logically

related, in scope, size, and kind, to compelling governmental

interests. See, e.g., Buckley, 424 U.S. at 29, 35-36 (upholding

disparate contribution caps for individuals and PACs). Because

Rhode Island's contribution cap gap does not penalize, coerce, or

unjustifiably burden first amendment rights, the district court

appropriately upheld the challenged provision.17


17We do not tarry over Leonard's claim that the contribution
cap gap violates her right to equal protection. First, the
statute does not impose unequal treatment but gives candidates an
authentic choice. Second, the statute treats candidates
differently on the basis of their actions rather than their

33

C. The Free-Television-Time Provisions. C. The Free-Television-Time Provisions.

We now examine Leonard's remonstrance against Rhode

Island's offer of free television time to candidates who comply

with the eligibility criteria for public financing. Since the

issues are purely legal, we afford plenary review.

1. Setting the Stage. To understand the free- 1. Setting the Stage.

television-time incentives that have raised Leonard's hackles, a

further exegesis is helpful. Under this heading, Leonard attacks

two different grants of in-kind assistance to gubernatorial

candidates who accept public financing. One such incentive is

limned in R.I. Gen. Laws 17-25-30(1), which entitles a

complying candidate to "free time on community antenna

television" pursuant to rules to be formulated by the state

Division of Public Utilities (DPU).18 The second such


beliefs actions which, as we have seen, possess differing
implications for the integrity and effectiveness of the electoral
process. The equal protection clause does not interdict such
classifications. See, e.g., Bray v. Alexandria Women's Health
Clinic, 113 S. Ct. 753, 760-62 (1993) (collecting cases
illustrating courts' denials of equal protection claims despite
statutes' unintended disparate effects on protected classes);
Buckley, 424 U.S. at 95 (upholding against equal protection
attack a system which actually excluded minority party
candidates); Jenness v. Fortson, 403 U.S. 431, 441-42 (1971)
(rejecting equal protection challenge to election law and
observing that "[s]ometimes the grossest discrimination can lie
in treating things that are different as though they were exactly
alike").

18Community antenna television (CATV) is a form of
television cablecasting regulated by the state DPU. See R.I.
Gen. Laws 39-19-6. Under current regulations and applicable
franchise agreements, cable operators dedicate one or more CATV
channels to the state to ensure public access. See DPU Rules
Governing CATV Systems, 14.1 (Jan. 14, 1983 rev.). The parties
do not dispute the DPU's authority to write additional
regulations implementing section 17-25-30(1) by providing free

34

incentive is outlined in R.I. Gen. Laws 17-25-30(2), which

entitles a complying candidate to "free time on any public

broadcasting station" operating under the jurisdiction of the

Rhode Island Public Telecommunications Authority (PTA).19

2. Preemption. Leonard's attack on the free- 2. Preemption.

television-time provisions proceeds on two fronts. Initially,

she contends that the Federal Communications Act (FCA) preempts

conflicting state laws, and that R.I. Gen. Laws 17-25-30 comes

within this proscription.20 We find no such irreconcilable

conflict.

The FCA reads in relevant part:

If any licensee shall permit any person who
is a legally qualified candidate for public
office to use a broadcasting station [or CATV
system], he shall afford equal opportunities
to all other such candidates for that office
in the use of such broadcasting station [or
CATV system].

47 U.S.C. 315(a), (c). This guarantee of equal opportunity has


CATV time to candidates. By like token, the parties do not
dispute that, if the DPU did promulgate such regulations, federal
communications law would apply.

19The state, through the PTA, owns and controls the air time
provided by section 17-25-30(2). The PTA is a public corporation
empowered to hold property and licenses in trust for the state.
See R.I. Gen. Laws 16-61-2. As such, the PTA is required to
"establish, own and operate" public broadcasting in the state, to
"apply for, receive and hold" the necessary licenses from the
Federal Communications Commission, and to exercise control over
programming on public television stations. See id. at 16-61-6.
We take judicial notice that the PTA currently operates WSBE-TV,
Channel 36.

20Leonard does not argue that Congress preempted state
regulation by occupying the entire communications field. See,
e.g., Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300 (1988);
French v. Pan Am Express, Inc., 869 F.2d 1, 4 (1st Cir. 1989).

35

both quantitative and qualitative dimensions. See Paulsen v.

FCC, 491 F.2d 887, 889 (9th Cir. 1974). Among other things, it

"encompasses such elements as hour of the day, duration, and

charges." Kennedy for President Comm. v. FCC, 636 F.2d 432, 438

(D.C. Cir. 1980).

Whether this federal guarantee preempts Rhode Island's

free-television-time provisions depends upon how one interprets

state law. Leonard argues that in explicitly guaranteeing state-

controlled television time to qualifying candidates at no cost,

the state intends to exclude all other (non-publicly-funded)

candidates from receiving comparable treatment. Any alternate

interpretation of the statute, she claims, would render it

purposeless.

We think Leonard's argument is deeply flawed. When a

statute provides a benefit to some, it does not necessarily bar

receipt of the benefit by others. Cf., e.g., Bowen v. Owens, 476

U.S. 340, 347 (1986) (explaining that a legislative body "may

take one step at a time, addressing itself to the phase of the

problem which seems most acute to the legislative mind")

(citation and internal quotation marks omitted); Baker, 916 F.2d

at 748 (holding that a state legislature may constitutionally

elect to address "only one aspect or a few aspects of a

multifaceted problem"). Put in concrete terms applicable to this

case, the Rhode Island statute grants free television time to

candidates who embrace public funding but it does not purport

to prevent privately financed candidates from reaping the same

36

benefit if some other law here, the FCA requires equal

treatment.

It is, moreover, axiomatic that, when a state

legislature has sounded an uncertain trumpet, a federal court

charged with interpreting the statute ought, if possible, choose

a reading that will harmonize the statute with constitutional

understandings and overriding federal law. See 1A Norman J.

Singer, Sutherland Statutory Construction 23.21 (4th ed. 1985 &

Supp. 1993) (collecting Supreme Court cases); EEOC v.

Massachusetts, 987 F.2d 64, 70 (1st Cir. 1993). We believe these

principles apply full bore to R.I. Gen. Laws 17-25-30.

We refuse to read Rhode Island's provision of in-kind

benefits in the overbold fashion that Leonard envisions.

Instead, we interpret the statute to mean what it says and only

what it says: it entitles publicly funded candidates to use

state-controlled television channels without charge but it does

nothing to interfere with, and does not contemplate interfering

with, the rights of privately financed candidates who wish to

petition for equal time and treatment under 47 U.S.C. 315.

Contrary to Leonard's suggestion, this interpretation does not

emasculate R.I. Gen. Laws 17-25-30(1) & (2); indeed, by

harmonizing the statutory provisions with federal law and

avoiding possible preemption, the interpretation lends

considerable vitality to the will of the state legislature. What

is more, the provisions, so construed, further a substantial

purpose: subsidizing all publicly funded candidates by providing

37

them with access to free television time. In other words, the

state law makes the public financing program more attractive not

because complying candidates receive something which their non-

complying counterparts do not, but, rather, because complying

candidates can be confident that the expenditure limits imposed

in consequence of the acceptance of public financing will not

prevent them from getting their message to the voters.

The bottom line reads as follows: there are no

indications textual or otherwise that Rhode Island's free-

television-time provisions aim to preclude non-complying

candidates from seeking either equal time or equal treatment;

there is a plausible interpretation of the state enactment which

reconciles it with overriding federal law; and this

interpretation gives the statute meaning without jeopardizing its

validity. Because we read the state law in this way,21 47

U.S.C. 315 does not preempt R.I. Gen. Laws 17-25-30(1) & (2).

3. Excessive Entanglement. Leonard has one last shot 3. Excessive Entanglement.

in her sling. She urges that the provision of in-kind benefits,

such as free television time, has a dangerous tendency to

entangle government in the internal workings of political

campaigns.

The electoral process is guided by legislatively


21This interpretation of R.I. Gen. Laws 17-25-30 requires
that we reject three other disparity-presuming contentions
advanced by Leonard. Read in the manner that we deem fitting,
the statute neither (1) penalizes a candidate for exercising his
or her right to boycott public financing, (2) denies equal
protection of the laws to such a candidate, nor (3) destroys the
voluntariness of the public financing program.

38

articulated rules designed to ensure fairness. A fine, but

important, line exists between this salutary rulemaking and

meddlesome interference in the conduct of elections. There is a

point where government involvement in the operation of political

campaigns may become so pervasive as to imperil first amendment

values. Were a state to loan out its workers as campaign

consultants, for example, voters and candidates might

legitimately complain that it had gone beyond laying down general

rules for office-seekers and begun tampering with, or even

manipulating, the electoral process. Such entanglement could

conceivably prevent the first amendment from accomplishing its

fundamental mission in respect to political speech: "to secure

the widest possible dissemination of information from diverse and

antagonistic sources, and to assure unfettered interchange of

ideas for the bringing about of political and social changes

desired by the people." Buckley, 424 U.S. at 49 (citations and

internal quotation marks omitted). In short, entanglement of

this insidious stripe runs too great a risk of creating a

convergence of pro-government voices.

Mindful of these concerns, courts must carefully review

legislative enactments that potentially entangle government in

partisan political affairs. In-kind incentives carry the seeds

of potential overinvolvement, especially when they implicate

access to state-run organs of communication. Nevertheless, the

first amendment does not rule out all in-kind offerings simply

because some of them may be too entangling. See, e.g., id. at 93

39

n.127 (noting that the government's extension of postal

privileges furthers first amendment values). Legislative bodies

(and, ultimately, courts) must separate wheat from chaff,

recognizing that, while some in-kind benefits may be excessively

entangling, others represent valid and innovative attempts to

confront new concerns in the ever-changing world of democratic

elections.

In our view, there is a spectrum of government

subsidization ranging from pure white and light gray a range

that would include such relatively unintrusive measures as

supplying public funding on politically neutral terms to jet

black and navy blue a range that would subsume such relatively

intrusive measures as furnishing campaign workers to specific

candidates. The closer an arrangement trenches to the non-

intrusive end of the spectrum, the less likely it is to fall prey

to a facial challenge grounded in the first amendment. After

all, so long as interference is slight, offering in-kind benefits

actually furthers first amendment values by increasing

candidates' available choices and enhancing their ability to

communicate. See id. at 92-93. 

In this case, Leonard has advanced no concrete reason

for believing that the free-television-time provisions will

excessively entangle the state in the day-to-day details and

decisions of the campaign. Because applicable federal laws and

regulations require equal time and treatment for all competing

candidates insofar as the electronic media are concerned, there

40

is no appreciable danger of lopsided state involvement in the

intricate process of scheduling television appearances. By like

token, there is no demonstrable risk that state power will

influence candidates' speech in a way that undermines first

amendment values. Accordingly, there is no excessive

entanglement. See, e.g., id. at 93 n.126 (concluding that claims

of excessive governmental involvement in respect to public

funding of political campaigns were "wholly speculative and

hardly a basis for [facial] invalidation").

IV. CONCLUSION IV. CONCLUSION

In its journey to ensure the integrity of the electoral

process, a state legislature must march across the hallowed

ground on which fundamental first amendment rights take root.

The terrain must be negotiated with circumspection and care:

disparities, in whatever guise, are not casually to be condoned.

Here, the Rhode Island General Assembly traversed the

minefield with mixed results. The disclosure threshold for PAC

contributors, as contrasted with the different disclosure

threshold for contributors to candidates, creates an

impermissible disparity violative of associational rights. A

second claimed disparity, involving the contribution cap gap is,

in part due to its relatively small size, non-penalizing, non-

coercive, justifiable, and, hence, constitutional. For all

intents and purposes, the third claimed disparity is virtually

non-existent: given the imperatives of extant federal law, the

free-television-time provisions of the state statute do not

produce significant differences in the benefits available to

various candidates for the same office. Thus, we, like the court

41

below, find that R.I. Gen. Laws 17-25-15(c)(1) is

unconstitutional, but that the plaintiffs' challenges to other

portions of Rhode Island's campaign finance law are bootless.

Nihilo ulterius requiremus pergere. The judgment below

will be

Affirmed. Affirmed.

42